# CASES

# THE COURT OF CHANCERY

## OF THE STATE OF NEW-JERSEY,

### APRIL TERM, 1842.

---

## Andrew Parsons v. The Monroe Manufacturing Company.

The act entitled "An act to prevent frauds by incorporated companies," passed February sixteenth, eighteen hundred and twenty-nine, applies not only to banks, but to all incorporated companies other than those specially excepted in the twenty-first section of the act.

There are certain provisions of the act intended to apply to banking companies alone, and when so intended they are referred to as "banks." But the act itself, by its general provisions, goes further, and reaches other corporations, and may be carried out as to them, without the aid of those special sections which are applicable to money corporations alone.

An injunction may be issued under the act, against a bank or other corporation, before the company have actually suspended business.

Where the bill of complaint charges, that the complainant is a stockholder and creditor of the company for a large amount, and specifies in what his claim, as a creditor, consists; that he has repeatedly called on the president of the company for payment, but that he has always failed to make payment; that the president has the entire control of the company; that he is insolvent and uses the property of the company for his own use; that the company is, to the belief of the complainant, insolvent, and unable to pay its debts, and unless this court interferes the whole property will be squandered; specifies various unauthorized acts committed by the president, subjecting the property of the company to the incumbrance of mortgages and judgments, without the authority of the board of directors; charges

[Parsons v. The Monroe Manufacturing Co.]

that the company owe a large amount of debts to other persons; that executions are in the sheriff's hands, by virtue of which the property of the company is advertised for sale, and that the company is insolvent according to the complainant's belief, owing to the mismanagement of the president: The facts and circumstances set forth are sufficient to justify the action of the court, and the bill is therefore particular enough in the allegations made.*

The whole proceeding under the act must rest upon the insolvency of the company. Unless that is satisfactorily made out, the court has no jurisdiction.

If the insolvency of the company is established, there still resides in the chancellor a discretion as to the ordering of an injunction and the appointment of receivers, to be governed by the facts and circumstances of the case.

The court may restrain a company from carrying on its ordinary business, or a bank from issuing notes, and yet leave the directors to settle up its affairs.

In judging of the solvency or insolvency of a company, its property should be estimated at its fair value, and not at the depreciated price which it might command at a forced sale.

The most unfavorable inference as to the condition of a corporation, may justly be drawn from the circumstance of the company's withholding its books upon an investigation touching its solvency.

If the insolvency of the company is satisfactorily established, and the circumstances of the case, in the opinion of the chancellor, call for his interference, an injunction will issue, though many of the creditors and stockholders petition against it.

THE bill of complaint in this cause, was filed on the twenty-eighth day of January, eighteen hundred and forty-two, by Andrew Parsons, a creditor and stockholder of "The Monroe Manufacturing Company," on behalf of himself and of all others who should come in and seek relief by, and contribute to the expense of this suit. The bill charges, that by an act of the legislature of the state of New-Jersey, passed the twenty-fourth day of February, in the year of our Lord one thousand eight hundred and thirty-eight, entitled, an act to incorporate " The Monroe Manufacturing Company," it was among other things provided, that a subscription might be opened for the stock of

---

* See the charges of the bill set forth at length, *post*.

said company, not to exceed two hundred thousand dollars, in shares of one hundred dollars each, and that as soon as fifty thousand dollars should be subscribed and paid, it should be lawful for the said company to commence their business; and the said act did appoint Samuel G. Wheeler, Patrick McGinnis, Jeremiah Carpenter, Arthur McGinnis and George A. Bicknell the first directors of said corporation; and it was further provided by said act, that Samuel G. Wheeler, Patrick McGinnis, Jeremiah Carpenter and Arthur McGinnis, and the survivors of them, and all such persons as might thereafter be associated with them, should be and were thereby constituted a body, corporate and politic, by the name and style of "The Monroe Manufacturing Company," for the purpose of manufacturing cotton and woolen goods, and dyeing, printing and bleaching cotton, woolen and silk goods, in the town of Paterson, and of carrying on the business incident thereto; and by that name they and their successors should have succession and continue a body politic and corporate, and should in law be capable of contracting and being contracted with, suing, pleading, defending and answering, and being sued, impleaded and answered unto, in all courts and places whatsoever, and that there should be five directors of said company. That by virtue of the said act of incorporation, the said company went into operation, and commenced business in Paterson, and one hundred thousand dollars having been subscribed, the company commenced operations, and have continued to transact their business as authorized by said charter to the present time:—that the complainant hath become a large stockholder in said company, and that he now holds two hundred and thirty-five shares of the capital stock of said company, amounting at par value to twenty-three thousand five hundred dollars; and further that the said company is indebted to the complainant in a large sum of money, among other things in the sum of five hundred dollars upon a draft given by said company in the complainant's favor, upon H. L. Van Wyck, for five hundred dollars, payable on the twenty-eighth of September, eighteen hundred and thirty-nine,

[Parsons v. The Monroe Manufacturing Co.]

and which draft has been protested; also in the sum of eight hundred and fifty dollars, on the note of said company, dated May first, eighteen hundred and thirty-nine, at sixty days; also in the sum of eight hundred and forty dollars and forty-four cents, on the note of said company, dated May the sixteenth, eighteen hundred and thirty-nine, at three months; together with the interest on these three claims.

That the complainant has repeatedly called on the president of said company, Samuel G. Wheeler, and requested him to pay to the complainant the said moneys due to him; that he has repeatedly promised to pay the complainant, but he has always failed to perform his said promises; that the said Samuel G. Wheeler, the president of the said company, has the entire control and management of the affairs of said company; that he uses the property of the said company as his own; that the said Samuel G. Wheeler is utterly insolvent; that all his property has been sold that could be found, and that a large amount of judgments against him in this state remain unsatisfied. That the said company, as the complainant believes, is insolvent and unable to pay its debts, and that unless this honorable court interferes the whole of the property will be squandered.

That the said company, by its president, on the sixteenth day of June, eighteen hundred and forty-one, without any order of the board for that purpose, executed a mortgage upon all the mills, lots of land, and water privileges, and also on all the machinery, gearing and appertenances, to Herman Swift, Edward H. Swift and Hamilton Gay, for the sum of fifteen thousand dollars; and that lately, on the nineteenth day of January, eighteen hundred and forty-two, he has confessed judgments for said company to the said Hamilton Gay, in the court of common pleas of Passaic county, for the sum of thirty thousand dollars of debt, besides costs; and another judgment to him in the same court, for the sum of five hundred and seventy-two dollars, besides costs; and that since then he has confessed another judgment to one Henry C. Stimson, for about three thou-

sand dollars; and that all these three judgments have been confessed without any order of the board for that purpose; and the complainant is informed and believes that there is a large amount of debts due from the said company to different persons, and that there are other judgments against the said company besides those above referred to, and that executions on all the judgments are now in the hands of the sheriff of the county of Passaic to be executed, and that he hath advertised the same for sale; and the complainant believes that the said company is insolvent, owing to the mismanagement of the said president, who has the entire control of the business; and the complainant believes that the said Samuel G. Wheeler uses the funds and property of the said company for his private benefit, and that the said company, in order to avoid the payment of their just debts, have suspended payment of their debts, and refuse and neglect to pay to the complainant what is justly due to him as aforesaid.

The prayer of the bill is, that the defendants may set forth and discover the goods and chattels, rights and credits, moneys and effects, and real estate of every kind and description, belonging to the said corporation, and that the complainant and the other creditors and stockholders of the said company, who may come in as parties to this suit, and contribute to carrying on the same, may be paid what is justly due them; and that the said "The Monroe Manufacturing Company," their officers and agents, may be injoined from receiving any of the debts due to the said corporation, and from paying or transferring any debts, moneys or effects of the said company, or from exercising any of the franchises or privileges granted by the said act of the legislature above mentioned and referred to; and that a receiver or receivers or trustee may be appointed, with full power and authority to sue for, collect, receive and take into his or their possession, all the goods, chattels, rights and credits, moneys and effects, lands and tenements, books, papers, choses in action, bills, notes and property of every description, belonging to said company at the time of their suspending business as aforesaid;

and to sell, convey and. assign all the said real and personal estate of the said company, and to bring into this court all the moneys and securities for moneys arising from such sale, or which the said receiver or receivers or trustee shall collect or receive by virtue of the authority vested in them, and according to the act of the legislature in such case made and provided. There is also the usual prayer for general relief.

Upon filing the bill the following order was made. "Upon opening the matter this day to the court, by Mr. A. S. Pennington, of counsel with the complainant, and upon reading the bill of complaint in this cause, and the affidivit thereto annexed, and on duly considering the same, it is ordered that the same be filed, and that thereupon an injunction do issue against the said defendants, according to the prayer of the said bill, except so far as to allow the defendants to manufacture goods until the further order of this court. And it is further ordered, that the hearing for a full injunction, and appointment of receivers of the said company, be fixed for the fifth day of February, eighteen hundred and forty-two, at. Trenton, at ten o'clock, A. M., and that notice be given to the said company of the same."

On the fifth of February the hearing was postponed on the application of the defendants, to the fourteenth day of March, on which day the cause came on to be heard before the chancellor, at Newark, upon the motion for injunction and appointment of receivers. Numerous depositions, ex parte affidavits and exhibits were taken and made by both parties, which were used upon the hearing, copies of the affidavits having been served according to the rules and practice of the court. Among other papers, a petition was presented on the hearing to the chancellor, from persons holding a large majority of the stock, praying that the injunction should not issue.

*A. S. Pennington* and *I. H. Williamson*, for complainants, in support of the motion.

*O. S. Halsted* and *A. Whitehead*, for defendants, contra.

[Parsons v. The Monroe Manufacturing Co.]

*Mr. A. S. Pennington.*    The only question is, whether this company is insolvent; if the company be insolvent, the stockholders have no interest.    The creditors and the community are interested, and it is for the public welfare that unsound institutions should be broken up.

A company may be placed in such a position, by judgments and executions against it, as to render it virtually insolvent; though if its property be rescued from forced sales, and its affairs be placed under judicious management, it may ultimately pay its debts in full.

Such was the case with the Mechanics' Bank at Paterson. It was declared insolvent; it was so, in fact, but having been placed in the hands of receivers, its debts were eventually paid.

The present direction, consisting of five persons, leaves the whole control of the company in the hands of the president; his salary is two thousand dollars per annum; the secretary, appointed by him, receives eight hundred dollars.

The company refuse to shew their day book and ledger.    The court must then, upon every principle, infer every thing against them.    Had not the contents of the books been fatal to the cause of the defendants, they would have been produced.

The president admits that he has used the funds of the company for his private purposes; his excuse is, that he always charged himself in the books of the company, with the amounts taken.

It appears, that on the twelfth of February, eighteen hundred and twenty-nine, he took of the funds of the company rising six thousand dollars, and assigned them his stock to that amount, at par, when in reality the stock was worth nothing.

He was indebted to the company over eight thousand dollars, and in payment, he transferred to the company a note of Carpenter for that amount, which is of no value.

On the first of September, eighteen hundred and thirty-eight, he transferred to Mr. Colt fifty shares of his own stock, and received therefor assets of the company to that amount, by a credit on the books.

17

On the fourth of May, eighteen hundred and forty, he transferred three shares of his stock to Mr. Lowe, and got a credit on the books of the company for that amount.

He has placed a mortgage upon the property of the company for fifteen thousand dollars, and has confessed judgments in their name for large amounts, without the authority of the board of directors.

He alleges that the company have met with no losses, and done a good business, yet it has never made a dividend. And what is now its condition? Where are its assets?

The whole value of the company's property, real and personal, as ascertained by the complainant's evidence, is forty-nine thousand five hundred and forty-four dollars and eighty-one cents. The value of this property, at a forced sale, would, as appears by the evidence, be reduced to thirty-five thousand dollars.

The debts of the company, some of which are disputed, amount to seventy-six thousand seven hundred and ninety-five dollars and seventy-four cents.

Taking the property at its appraised value, the insolvency of the company will be twenty-seven thousand dollars; if disposed of at a forced sale, it will amount to forty thousand dollars.

The president told Stimson that the company could not pay over fifty cents in the dollar; he has said the same thing, in substance, to others. By general reputation, the company is insolvent. But one witness has been inquired of by the company as to their credit, and he did not go so far as to say he would give them credit for one hundred dollars.

If the injunction be removed, the mortgage to Gay will be confirmed by the board, and the whole property of the company would be in his hands. The business of the company is now, in fact, carried on by him; without his aid their operations must at once cease.

*Mr. O. S. Halsted*, for defendant, contra.

The act under which this proceeding is adopted, if applica-

[Parsons v. The Monroe Manufacturing Co.]

ble to any other corporations than banks, must have reference alone to the creditors and stockholders, not to the public.

It is denied to be a mere question of the company's insolvency. But is it, in the opinion of the court, for the interest of the creditors and stockholders to put the company into process of liquidation? That is the true and only issue.

From an examination of the phraseology of the act, and especially of the sixth section, it is manifest that it was not intended to apply to a company in a state of embarrassment, or temporary inability to pay its debts. Upon the complainant's construction of the act, a company may, from unexpected losses, or sudden revulsions in business, or the monetary affairs of the country, be laid hold of and crushed, by the interruption of its business and a forced sale of its property, when if left alone, it would recover from its embarrassments, pay its debts, and be enabled to continue its business.

Place the construction contended for by the other side, upon this act, and incorporated manufacturing companies must cease to exist.

The phrase "not about to resume," used in the sixth section of the act, shows that it was designed to reach only prostrate institutions.

A company is not insolvent because at a forced sale of its property it may not be able to pay its debts. The view to be taken is broader; unless the interests of the creditors and stockholders require this proceeding, it cannot be properly sustained.

The object and effect of the present proceedings, is to produce insolvency. The difference of one cent per yard in the sale of its manufactured goods, will increase or diminish the profits of the company thousands of dollars.

It appears by the evidence, that the company is now manufacturing for Gay, he furnishing the raw materials. They may thus do a profitable business without hazard, and be enabled to redeem themselves.

If the company, at this time, upon a cash valuation, or even

[Parsons v. The Monroe Manufacturing Co.]

at a fair valuation of their stock, cannot pay all their debts, it does not follow that this proceeding can be sustained.

At this juncture in the political condition and business prospects of the country, it is a harsh and cruel proceeding to stop the operations of this company.

The yearly product of the business of the company, is six per cent. on one hundred thousand dollars. This has not been taken into account in any of the valuations of the company's property. In eighteen hundred and thirty-eight, this property was valued by disinterested men at seventy-six thousand dollars. Improvements have since been made to the value of nine thousand dollars.

The complainant's mortgage is second in order of priority, and is therefore safe. His claim on notes and otherwise, unsecured, is subsequent to all the mortgages and judgments, and a forced sale will therefore be prejudicial even to him.

The stockholders and creditors all object to this proceeding, not one of them advocates it except the complainant.

They alone are interested in this proceeding, the public have no concern with it. The term "safety to the public," used in the act, showed that the act has reference only to banks, and not to other incorporated companies.

The insolvency of the president of the company, is not denied. But that can have no bearing on the case, if he is competent and commands the confidence of the stockholders.

*Mr. A. Whitehead*, on the same side.

This proceeding calls for the exercise of a very high power. It should not be exercised unless the proof be clear and explicit.

The complainant's bill is defective. It does not contain sufficient charges to warrant the interference of the court.

1. The insolvency of the company is not shown or alleged. The allegation is, that the company are indebted to a large amount. There is no statement of facts that warrants the inference that the company is insolvent.

2. There is no averment that the company have suspended business. There can be no case that will justify the court in proceeding by injunction under the act, (except against a bank,) until the company have actually suspended their business.

If a company is in its regular course of business, the court has no jurisdiction. This is apparent from the phraseology of the act. It speaks of "suspending business," and "not about to resume its business." In the case of a bank it may be otherwise, because there are certain tests given, which are evidence of a suspension, such as not paying notes when presented, &c.

3. There is nothing imperative on the chancellor to act, even if insolvency be proved. "The circumstances of the case, and the ends of justice" requiring it, he may appoint receivers, not otherwise. There is a clear discretion to be exercised by the chancellor, in view of all the facts of the case. There must be some interest advanced, in order to justify the proceeding.

4. This application has been induced by the refusal of the president to pay his private debts with the property of the company. Upon the complainant's own show, a sale will not pay off the prior mortgages, and must be ruinous to the interests of the general creditors of the company.

The claim of the complainant against the company, is only admitted by the defendants to the amount of about sixteen hundred dollars.

Other claims are disputed; some of them are for unliquidated damages. The actual amount of the company's indebtedness is much less than is represented by complainant.

The question as to the management of the company by the president, cannot enter into this case.

The mill is now in good order and in successful operation. It ought not to be interrupted. The interest of no one will be promoted by the proceeding.

*I. H. Williamson*, for complainant, in reply.

The power of the court is complete, when a company is insolvent, it need not have stopped business.

17*

It is not compulsory in the court to interfere, even in a case of insolvency; there is a discretion to be exercised on the whole case. This is admitted. The power is tremendous, but salutary.

The bill need not charge that the company cannot resume business, but must charge insolvency.

The general scope of the act, its several provisions, and particularly the last section, declaring what corporations it shall not extend to, shows that the act applies to manufacturing companies.

If a company must first suspend before the act operates, then the act is useless.

A company is insolvent when their capital is gone; when they cannot and do not pay their debts.

This company is insolvent from their own show.

Out of the assets, put down at sixteen thousand dollars, there is not over one thousand and five hundred dollars that is good.

No dividends have ever been made. It is no part of the case as to what the prospects are, but are they now insolvent? that is the question. The president admits the company unable to pay. See the evidence of Mr. Stimson. Mr. Biggs, who built the water-wheel, would not trust them. Wheeler wanted him to take fifty per cent. on his debt, in notes. In December, eighteen hundred and forty, Wheeler wrote a letter to the complainant, saying the company could not pay, and requested him to offer the stock at seventy-five per cent. or fifty per cent. Is the stock worth any thing? Would any body give any thing for it?

Why do not the company produce their books of account? If the company is solvent and all is right, why do they withhold their books? They refused them to Mr. Parsons, a creditor, to the master, to us and to this court. On this ground every presumption is against them.

The company being insolvent, the only question remaining is, whether this is a case calling for the interference of this court. It loudly calls for it.

The charter is abused. The board consists of five directors,

[Parsons v. The Monroe Manufacturing Co.]

and a majority being three, may control. The act requires a book to be kept of their proceedings. It appears that Wheeler and McGinnis subscribed all the stock except two shares, and those to make directors of. Wheeler and McGinnis owned the mill known as the Beaver mill, before this company was constituted. The business has never been conducted by a board of directors.

Mr. Wheeler has been in the habit of using the funds for his private purposes, as appears by his own affidavit. He admits he has given the company notes for his private debts, and was charged with them in the books, and they were settled. How? To what extent? He does not state, nor is it otherwise made to appear. Carpenter's note is dated in June, and in December he enters the note to his credit.

The president sold part of the lands of the company; gave a mortgage to Mr. Gay for fifteen thousand dollars, in the name of the company. He has confessed judgments in behalf of the company. This property was about to be forced to a sale. It is a strong case; the strongest possible. The course taken by the complainant was his only course to save his money.

The creditors and stockholders signed their request that no judgment might issue, under the belief that the company is solvent.

This law was made for the protection of the public, as well as for the creditors and stockholders, and their safety should be regarded in proceedings under it.

THE CHANCELLOR. The Monroe Manufacturing Company was incorporated on the twenty-fourth of February, eighteen hundred and thirty-eight, by a law of this state, for the purpose of manufacturing cotton and woolen goods, and dyeing, printing and bleaching cotton, woolen and silk goods, in the town of Paterson. The provisions of the act are much the same with those in ordinary charters of this kind, with a capital not to exceed two hundred thousand dollars, to be divided into shares of one hundred dollars each, but with power to commence busi-

ness whenever fifty thousand dollars of the capital stock should be subscribed and paid in. The number of directors fixed by the act is five, and of course three is a majority for the transaction of business.

The application for this charter was made by Samuel G. Wheeler, who was the principal owner at the time of the Beaver mill, with its machinery and appendages, and who, being much embarrassed, deemed this arrangement beneficial to his interests. The result was nothing more than putting the Beaver mill, with its machinery and appertenances, then belonging to Mr. Wheeler and Patrick McGinnis, (but principally the former,) into a joint stock company, and dividing it up into shares of one hundred dollars each. Accordingly, among the first directors named in the act, were these two gentlemen, with three others, who appear to have been their friends and relatives. Shortly after the act passed, the subscription for the stock was opened, and Samuel G. Wheeler subscribed seven hundred and forty-eight shares, Patrick McGinnis two hundred and fifty shares, Arthur McGinnis one share, and Jeremiah Carpenter one share—being in all one thousand shares, which, at one hundred dollars a share, made a capital of one hundred thousand dollars. On the same day the directors met, and resolved that the Monroe Manufacturing Company purchase of Samuel G. Wheeler and Patrick McGinnis, the cotton and woolen mills, dye-house, and all the machinery belonging to the same, and known as the Beaver Mill Company, for the sum of one hundred thousand dollars, and that certificates of stock to that amount, (except the two shares subscribed for by Arthur McGinnis and Jeremiah Carpenter,) be issued to Samuel G. Wheeler and Patrick McGinnis.

By this division of the stock, the whole power of the company and over the property, was placed in the hands of Samuel G. Wheeler, as much so as it had been while conducting the Beaver mills; and to add to it, he was appointed president, with a salary of two thousand dollars a year; and by one of the by-laws, that officer is invested with the entire oversight

and supervision of the property and affairs of the company, is to direct the purchase of all stock and other things necessary to carry on the works, is to direct in the sale of all goods, to collect all bills of work done by the company, and arrange the hire of all clerks and operatives necessary to carry on the business. There was a secretary appointed, and a clerk, whose salaries were also to be fixed by the president.

After this organization, and the adoption of the by-laws, the minutes of the company do not show any thing more done than the holding of an annual election for directors, and the reappointment of the president and secretary, except a vote of the directors authorizing Samuel G. Wheeler to take for his own use an inventory of property amounting to six thousand five hundred dollars, by surrendering to the company the same amount of the capital stock.

Thus organized, and with such powers conferred upon the president, this company commenced business, and has continued to the present time. The stock, according to the books, is now scattered, and held either absolutely or as collateral security, by others than the original subscribers; Samuel G. Wheeler appearing to be the owner of ten shares only, and Patrick McGinnis of none.

The sale of six thousand five hundred dollars worth of the company's property, although taken at the price at which it was inventoried, and although the stock of Mr. Wheeler was transferred for its payment to the same amount, still reduced the ability of the company to pay debts so much; and the president admits that he may have given the notes of the company for his own debts, but never without being charged with them on the books of the company, and they have been settled. It also appears that the Carpenter note, for eight thousand dollars, was passed to the company by the president, in discharge of his indebtedness to them. The president also admits himself personally insolvent.

The present bill is filed by a creditor and stockholder, against the company, as being an insolvent institution, for an injunc-

[Parsons v. The Monroe Manufacturing Co.]

tion to stop its further operations in business, and for the appointment of receivers to settle up its affairs, under the provisions of the act, entitled, "An act to prevent frauds by incorporated companies," passed the sixteenth of February, eighteen hundred and twenty-nine. When this bill was presented, a limited injunction was ordered, to restrain the company and its officers from collecting and receiving debts, or paying out any of the moneys of the company, (except to the hands employed,) or from selling any of the property, or transferring the securities on hand, (but not stopping the ordinary business of the mill,) until the parties could be heard; and notice of the application for a more full injunction, and the appointment of receivers, was directed to be served on the defendants. That notice was served, and on the day named a further time was granted the defendants to, prepare to meet the charges in the bill. Depositions have been taken fully on both sides, and the cause argued much at length, and with great ability, and I am now to state to the parties the result to which I have come.

A grave question is made at the outset, whether the provisions of the act under which this proceeding is had, applies to a corporation created for manufacturing purposes, or indeed to any other corparation than a bank? That the primary object of the legislature was to reach banks, is manifest from the whole scope and tenor of the act. Some of its provisions declare when a bank shall be deemed and taken to be insolvent, as when two of the directors, or the cashier, shall admit it to be so, or it shall refuse to pay its debts when demanded within the usual and proper hours of business, or shall not redeem its notes in specie, &c. These were designed as tests, which the court might take on the question of insolvency, and, no doubt, from the difficulty without them of coming to any conclusion on so difficult and delicate a point. I have never, however, considered these as any thing more than evidences of insolvency, which may be overcome, even in the case of a bank, by other and stronger proof. The court would, no doubt, be justified in act-

ing upon these, in the first instance; but they may be explained, and the institution shown to be sound and safe.

But because this special provision for discovering insolvency, is made in the case of a bank, it by no means follows that other portions of the act may not have a more general operation. When, in these sections, special reference is had to a bank, it is called a bank, or an incorporated bank, or a banking company, while in the other general provisions they are referred to as "incorporated companies," without qualification or limitation. The title of the act is, "An act to prevent frauds by incorporated companies," not by banks only; and the sixth section, which authorizes the chancellor to act, declares that he may do so whenever any incorporated company shall become insolvent.

By a fair construction of the act, it is manifestly the intention of the legislature to confer this power (which I admit to be very great) of granting injunctions in cases of insolvency, against other companies than incorporated banks. There are certain provisions intended to apply to those only, and when so intended, they are referred to as banks; but the act itself, by its general provisions, goes farther, and reaches other corporations as well as these, and may be carried out as to them without the aid of those special sections which are applicable to money corporations alone.

If any doubt, however, existed as to this part of the case, it should be settled by the last section of the act. By that section, it is provided, that nothing in the act should apply to any incorporated bridge, road or turnpike company, or literary or religious society.

The corporation in question here, is confined to manufacturing purposes alone, and being within the plain meaning of the words used in the act, and not coming within the exceptions in the last clause, must, as it appears to me, be considered within the general object and intention of the legislature. This was so held in the case of the Rahway Manufacturing Company, and an injunction ordered, and a receiver appointed by my immediate predecessor, and sustained by the present chief

justice sitting for the chancellor, although the order was reversed afterwards upon the merits, in the court of appeal.

It is further insisted, that this power of issuing an injunction, cannot be exercised against a corporation, other than a bank, until the company has actually suspended business. The phraseology, in many parts of this act, is obscure, and there is something in the language used in the sixth section that might, at first view, lead to this impression. The language is, "if upon such inquiry into the matters or cause of complaint, it shall be made to appear to the chancellor, that the said company has become insolvent, and shall not be about to resume its business in a short time thereafter, with safety to the public and advantage to the stockholders," then an injunction may issue.

If it be admitted (and the argument virtually so admits) that you may injoin a bank under this act, before its suspension, then certainly you may any other corporation coming within its provisions, for it is under the same section (the sixth) that the power is conferred, and it is alike in all cases. By the seventh section, it is quite plain, you may proceed against a bank while pursuing its usual course of business, if either of the events there stated happen ; and indeed without this power, if the court must wait for a suspension, all use of the act for the prevention of evil, would be lost. There is nothing that I can perceive in this respect, to distinguish the application in the case of a bank, from that against any other company, and this section was no doubt intended to mean nothing more, than that in cases where the company has suspended business, the chancellor will enquire into the prospect of its resuming again, with safety to the public, and was not intended to limit the powers of the court to the happening of such an event. In some cases the company will have stopped business, and in some not ; if they have stopped, it will then, and very properly, enter into the consideration of the case, as to what the prospect of its again resuming is.

It is further urged, that if this law applies to this company,

and that too while carrying on business ; that the bill is imperfectly drawn, and does not contain the charges necessary for that purpose. The objection to it is, that the facts and circumstances of the case are not sufficiently set forth to enable the chancellor to determine on the propriety of interfering.

I have carefully looked into this bill, and it does not appear to me liable to this objection. The complainant declares himself to be a stockholder and creditor for a large amount, and specifies in what his claim as a creditor consists ; that he has repeatedly called on the president of the company for payment, but he has always failed to make payment. The bill then charges, that the president has the entire control of the company ; that he is insolvent and uses the property of the company as his own and for his own use ; that the company is, to the belief of the complainant, insolvent and unable to pay its debts, and unless this court interfere the whole property will be squandered. The bill then recites the unauthorized acts of the president, by giving a mortgage for fifteen thousand dollars upon all the property to the Swifts and Gay, and a confession of judgment to the same amount to Mr. Gay ; by confessing another judgment to him for five hundred and seventy-two dollars, and another to Henry C. Stimson for three thousand dollars, and all without authority from the board of directors. Besides these judgments, it is charged that the company owe a large amount of debts to other persons, and that other executions beside those on the judgments above stated, are in the hands of the sheriff of Passaic county, and that the property is now advertised for sale by the sheriff on the said executions. The company is stated, further, to be insolvent, according to the belief of the complainant, from the mismanagement of the president.

It appears to me that the facts and circumstances here set forth are sufficient, if true, to justify the action of the court, and that the bill is, therefore, particular enough in the allegations made. It would, indeed, be very difficult for a creditor, in a majority of cases, to go more into detail than is done in this bill.

The great questions to which we must come in this cause, are, first, Is this company insolvent within the meaning of the act? and, second, Do the facts and circumstances of the case call for the interference of the court?

I agree entirely with the counsel of the defendant, that the foundation of this whole proceeding must rest on the question of insolvency: for unless that is satisfactorily made out, the court has no jurisdiction; and when made out, there still resides, and must reside in the chancellor, a discretion as to the ordering of the injunction and the appointment of receivers, to be governed by the facts of the case. It may be that the court will find it proper to restrain a company from carrying on further business, or a bank from issuing notes, and yet leave the directors to settle up its affairs. The court may, at pleasure, grant or reject the prayer in part or in whole. It is necessary that this discretion should be with the court, but at the same time it must not be arbitrarily or unjustly exercised. And if the case come fairly within the provisions of the act, and is one which the legislature intended to provide for, the court is bound to give effect to it, and to enforce its requirements.

1. As to insolvency: Is this company insolvent?

The president has declared the company insolvent, both to Mr. Stimson and Mr. Biggs, and that fifty cents on a dollar was as much as it could pay. There is a mortgage on the property now in process of foreclosure, in favor of Mr. Coster, for twenty-five or twenty-six thousand dollars, and executions in the hands of the sheriff of Passaic county amounting in the whole to a sum exceeding twenty thousand dollars. These executions, ten in number, the sheriff says, were received by him during the last February term of the court, and are remaining unsatisfied in his hands.

These facts show great embarrassment, at all events; but the parties have gone more into detail. The complainant has caused the property of the company to be examined by nine gentlemen residing in Paterson, men of respectability, and said to be good judges. They estimate its value at forty-eight thou-

[Parsons v. The Monroe Manufacturing Co.]

sand four hundred and eighty-four dollars and fifty-six cents. Several of these persons have been examined, and declare that they made a careful investigation of the matter, and placed a fair value on the property, and that if sold at a forced sale it would not bring exceeding thirty-five thousand dollars. I am well satisfied that property should be judged of at its fair value, and not at the depreciated rate at which a forced sale might bring it.

The defendants have also had the same property examined by two respectable gentlemen, and they estimate it at sixty-nine thousand and twenty-eight dollars. The items of property valued, it will be found, are the same, the difference consisting only in the prices carried out.

The variations in these values are very material. Take, for instance, the value of the lot on which the mill stands, with the water privileges. It is fixed by the complainant's witnesses at fourteen thousand dollars, and by the defendants' at twenty thousand dollars. So with the next item : the building is valued by the complainant's witnesses at ten thousand dollars, and by the defendants' at twelve thousand dollars. The remaining items, with very few exceptions, vary in the same way. With this contradiction in the evidence, and with no personal knowledge of the value of the property, the rule of law would require that I should be governed by the weight of evidence, by which that of nine on the one side, of equal intelligence and respectability, would overbalance the two on the other, without a resort to any invidious distinction between the witnesses. There is one fact, however, disclosed by the evidence of Mr. King, one of the defendant's appraisers, that I cannot shut my eyes against. He says the statement of the property, with the prices carried out just as it now appears, was first made by the president of the company ; that they went through the mill with him, and fixed the valuation at the same prices that he had done. This would seem, at all events, to evince great reliance on the judgment of Mr. Wheeler, and really to amount rather to his own estimate, than that of the other men. I mean

to infer from this that nothing wrong was intended by these appraisers, beyond a falling in or acquiescence with the views of Mr. Wheeler, as to the general estimate of his property. It would seem that the nine appraisers on the part of the complainant made their own estimate, without any guide of this character.

Independent of the property thus valued, the assets of the company are put down at sixteen thousand four hundred and fifteen dollars and ten cents. These several items are canvassed in the evidence; and their real value from that is very small. One item of eight thousand dollars, in J. Carpenter's note, the president considers good, and from a conviction that Mr. Carpenter will succeed in a suit depending in the supreme court of the United States. This suit, it seems, has recently been decided in that court against Mr. Carpenter, and of course the hope on which its recovery is put has failed. A sum of thirteen hundred and twenty-four dollars and forty-four cents, due from the Beaver mill, is abandoned. A claim of five thousand and ninety dollars, against John G. Coster, stands at present with a decision against the company except as to a part, and that a moderate part of that sum. The president himself, also, is placed as a debtor for five hundred and fifty dollars, and he declares himself insolvent. There is scarcely an item on the list of assets, about which a doubt as to recovery does not exist, and it is to me very uncertain, from the evidence, whether any thing beyond a very few thousand dollars, perhaps two or three thousand, will ever be realized to the company from that source.

From this estimate of the property and assets of this company, paying that respect to the evidence which the rules of law require, it would not much exceed in value fifty thousand dollars, and should we even take a medium estimate from the two sets of appraisers, it would not exceed sixty thousand dollars. The debts of the company are stated by the president of the company at sixty thousand dollars, and by an estimate furnished by the company at fifty-nine thousand, five hundred and fifteen dollars and fifty cents. To this sum there must be added the

amount of a mortgage on the property, given by Mr. Wheeler while owner, on which there remains unpaid somewhere about seven thousand dollars. This mortgage is in the hands of the complainant, and I confess there is some embarrassment respecting it; but from all the facts, if I rightly understand the case, it would seem to be a question rather, who was entitled to receive the money, than as to the ultimate liability of the property for its payment. If the company has never paid off this incumbrance, it would be very unsafe in this case to consider is as discharged from all liability, on account of the dispute among the present holders. If it was passed to Mr. Colt for his security, and he passed it again to Mr. Parsons for his indemnity against his notes given on that account, there would seem to be a just claim against the property of the company for one or the other of these persons. If this mortgage is still a valid one, the indebtedness of the company is thereby increased seven thousand dollars. The claim of Mr. Parsons, the complainant, is put down in this estimate at about fifteen hundred dollars; the evidence shows his debt to be larger than this at all events, and he claims a sum rising four thousand dollars.

Forming the best judgment in my power from this whole evidence, with the position of the claims, and the urgency of the demands on the company, by executions hanging over it, and only restrained by the order of this court until this question can be settled, I can come to no other conclusion, than that this company is insolvent, and hopelessly so in its present condition. The whole capital is sunk, and its present property not able to pay the demands against it. It has been in operation since eighteen hundred and thirty-eight, and has, according to the evidence, been carrying on a fair business, but yet no dividends to the stockholders have ever been made, and we now find it in this embarrassed situation. There is one fact to which I should not fail to recur; the company refuse to produce their books of account, though repeatedly called on for that purpose. What those books would show, if exhibited, it is impossible to say, but

18*

[Parsons v. The Monroe Manufacturing Co.]

the most unfavorable inference may justly be drawn from with-holding them on an investigation of this character.

The last question involves the consideration of the propriety of the court interfering in this case. At the call of a creditor against a company standing as this does, I have no hesitation in coming to the conclusion, that I am imperiously required by a sense of public duty, to interpose by way of injunction, and the appointment of receivers. It would have been grateful to me, could I have come to a different result; but when I look at the organization of the company, at the fact that the whole power is virtually in the hands of one man, that we find a mortgage given on the property, and judgments confessed for large amounts without any order from the board; when I see that the capital is gone, without any dividends ever having been made, and the property remaining unequal to the discharge of the claims against it, with ten executions now in the hands of the sheriff, I cannot say that the complainant has come here without good grounds. Unless I am prepared to declare the law a dead letter, and refuse to give effect to it, there appears to my mind no other alternative than to enforce its provisions in this case. My reluctance to interpose, has been increased by the desire expressed in the petition from several of the creditors and stockholders, that the company might not be injoined; but from these petitions, it is quite evident they act under (what I believe) a misapprehension of the case, and that is, that the company is solvent. Had the investigation brought me to that result, I should certainly not have interposed, but being satisfied fully on that point, I cannot comply with their request.

The injunction, according to the provisions of the act, must therefore be issued, and receivers appointed.

" This cause being opened to the court by Mr. A. S. Penning-ton, of counsel with the complainant, at a special court held at Newark, on the fourteenth day of March, in the year of our Lord eighteen hundred and forty-two, and upon reading the proofs and exhibits taken in this cause, and upon hearing the

arguments of counsel on both sides, the court thereupon took time to consider of the same, and now on this fifth day of April, in the year of our Lord eighteen hundred and forty-two, at a court of chancery held at Trenton, at the stated term of said court, the chancellor being satisfied of the sufficiency of the application made by the said complainant in the said bill, and also of the truth of the facts and allegations therein contained : it is ordered and directed by the chancellor, that a writ of injunction do issue out of, and under the seal of this court, directed to " The Monroe Manufacturing Company," and all and every of its officers and agents, to restrain them, " The Monroe Manufacturing Company," and all and every of their officers and agents, under the penalty of five thousand dollars, to be levied on their and each of their lands, goods and chattels to our use, from exercising any of the privileges or franchises granted by the act incorporating said company, and from collecting or receiving any debt, and from paying out, selling, assigning or transferring any of the estate, moneys, funds, lands, tenements or effects of the said company, until this court shall otherwise order.

" And from the circumstances of this case, the ends of justice requiring it, this court doth appoint George A. Ryerson, Benjamin W. Vandervoort and David Burnett, esquires, receivers, with full power and authority to demand, sue for, collect, receive and take into their possession, all the goods and chattels, rights and credits, moneys and effects, lands and tenements, books, papers, choses in action, bills, notes and property of every description belonging to the said company at the date of this order, and to sell, convey, lease or assign all the said real and personal estate, and pay into this court to the account of the said receivers, in some safe place of deposit, to be selected by the said receivers, to the credit of this cause, all moneys and securities for moneys arising from such sales or leases which the said receivers shall collect or receive by virtue of the authority vested in them, to be disposed of by the said receivers from time to time, under the order of this court; that the receiv-

ers shall first take and subscribe the oath or affirmation directed in and by the act entitled, "An act to prevent frauds by incorporated companies;" and that the said receivers shall be deemed and taken to be receivers for the creditors and stockholders of the said company, with full power and authority, whenever they shall deem it proper, to institute suits at law or in equity, in their names as receivers as aforesaid, for the recovery of any estate, real or personal, debts, rights in action, damages and demands whatsoever and wheresoever existing in favor of the said company at the time of the date of this order, or accruing subsequent thereto; and that the said receivers be also vested with all other powers and authority given and granted in and by the act last mentioned and the supplement thereto, and have liberty to apply to this court as occasion may require; and all other directions concerning the said receivers are to be subject to the future orders of this court."