New Jersey Fidelity and Plate Glass Insurance Company (New Jersey) was taken over by the commissioner of banking and insurance May 28th, 1932, and the bills are by creditors to recover from Commercial Casualty Insurance Company (Commercial) over a million dollars in securities, transferred by New Jersey, on the eve of its collapse, to Commercial, in payment for reinsurance of part of New Jersey's policy liability, on the ground that New Jersey was insolvent and had suspended its ordinary business for want of funds to carry on the same and that the transfer was in violation of section 64 of the Corporation act and null and void as against creditors.
New Jersey was incorporated under a special act of the legislature in 1868 (P.L. p. 1176), with a capital of $50,000, and authorized to carry on the business of plate glass insurance. From time to time it increased its capital until it reached $800,000; gradually adding various types of insurance, it extended its operations throughout the states from its main office in Newark, New Jersey.
New Jersey's annual report as of December 31st, 1931, disclosed that it had paid over $1,500,000 in surety losses during the year and that there were unpaid claims running into the millions. Uneasy, the department of banking and insurance made an examination and report, March 30th, 1932, and found that during 1931 the company's disbursements exceeded its income by over a million dollars; that its capital of $800,000 was impaired to the extent of $742,656.78, and, taking its securities, other than mortgages, at their market value, its liabilities exceeded assets by $323,092.53. In arriving at this result the department excluded as assets two items aggregating $846,624.38, made up of so-called not admitted assets of $399,674.15 and ownership of Hedding Holding Company, holder of $446,930.23 in mortgages on vacant land in Philadelphia, acquired in salvaging a loss. There were over $3,500,000 in liability claims, and $6,000,000 of bonds and mortgages guaranteed by the company were in default in interest, for which the company faced a call for *Page 550 
payment of the principal. A further examination and report as of May 28th, 1932, disclosed that between January 1st and May 19th, 1932 (the date of the reinsurance agreements), the company paid out $862,000 in losses; liability claims increased to over $5,000,000; there were over half million dollars of actually due and payable unpaid claims, and six judgments against the company aggregating $110,327. The deficiency had increased; collections were slow, the company had borrowed from all available sources; its cash balance was but $27,000 and it was unquestionably insolvent, both in the sense that its liabilities exceeded its assets and in the legal aspect that there was general inability to meet its obligations as they matured; and its directors knew it. In the early stages the department had demanded of the company that it raise a million dollars additional capital as a condition to continuing business and because of this, the later developments and the dilemma in which it found itself, New Jersey approached Commercial and, under date of May 19th, 1932, New Jersey entered into two reinsurance agreements with Commercial. By one, Commercial assumed as of May 1st, 1932, all the real net policy liability of New Jersey within the States of California, Oregon and Washington, for the following classes of business, viz.: automobile liability, liability other than automobile, workmen's compensation, plate glass, burglary and theft, automobile property damage, automobile collision, property damage and collision, other than automobile, and all fidelity and surety risks written through agents, Potter's in San Francisco and Jones Company in Spokane, Washington.
For this New Jersey agreed to pay Commercial the unearned premium on the risks, less a commission of forty per cent., in mortgages, at par, acceptable to Commercial. By the other agreement Commercial assumed as of May 20th, 1932, all the net policy liability elsewhere in the United States of the classes of insurance mentioned in the first agreement, except fidelity and surety risks. For this New Jersey agreed to pay the unearned premium, less a commission of thirty-five per cent., in New Jersey municipal bonds of the face value of $633,700, *Page 551 
but at an agreed value of $473,000 plus interest, and the balance, $527,450, in mortgages to be selected by Commercial out of a batch of a million dollars worth. New Jersey agreed to transfer to Commercial all its good will and interest in the insurance business covered by the agreements, its books and records, and its furniture, fixtures, maps and supplies, except its home office in Newark, and covenanted that it would not at any time thereafter engage in or carry on the business of insurance of any kind except in liquidation of its existing affairs and, as specifically provided therein, viz.: to carry on for Commercial until Commercial could take over its agencies.
Under date of May 20th, 1932, Commercial addressed two letters to the agents of New Jersey, one signed by the president of New Jersey, stating:
"However, despite the fact that we were organized in 1868, and our long years of operation since that time, the present day conditions make it wise for us to discontinue active operations."
And, after advising them of the reinsurance and urging them to accept agency with Commercial, continued:
"If you do not accept the agency of one of the Loyalty Group Casualty Companies and do not so wire Commercial Casualty Company, you are definitely instructed to cease writing any and all business for account of this Company immediately upon receipt of this letter. In any event you are definitely instructed to immediately cease writing all Fidelity and Surety lines. In this connection it is proper to call to your attention that Commercial Casualty does not reinsure any Fidelity and/or Surety liability of New Jersey Fidelity Plate Glass Insurance Company."
The other letter, addressed to the agents and signed by the president and by Neal Bassett, chairman of Commercial, confirmed the reinsurance agreements and invited them to become agents of Commercial.
Between May 20th and 28th, New Jersey made payment for the reinsurance by transferring to Commercial the municipal bonds, and delivering bonds and mortgages to the amount of one million dollars, from which Commercial made *Page 552 
its selection and on May 28th, the directors of New Jersey ratified the reinsurance agreements and called "curtain." It "resolved that the commissioner of banking and insurance of the State of New Jersey be requested to take charge of the affairs of this company, pursuant to the provisions of the statute of New Jersey in such case made and provided." Upon taking charge, the commissioner was requested to recover the securities from Commercial, but refused, whereupon the complainant Industrial Acceptance Corporation, with a claim of $26,000, filed its bill in which it was joined by American Glass Company, a creditor for $72,000. Later Central-Penn National Bank, a judgment creditor in the amount of $161,000, filed its bill in which it was joined by Philadelphia National Bank, a judgment creditor in the amount of $113,000. An order was entered that Commercial segregate the securities and hold them or the proceeds intact until the final hearing.
The primary objection to recovery is that the unearned premiums were held in trust for reinsurance and that the fund was appropriately devoted to effecting the reinsurance in discharge of the trust. Counsel has with great pains searched the history of insurance and has devoted most of his brief to an interesting and learned discussion of insurance as an "institution" and reinsurance as an ancient and established practice among insurers to fortify his trust theory, and that unearned premiums are and always have been sacredly held to the use of the insured to make reinsurance. We are willing to let pass without challenge all he has so carefully composed and clearly and understandingly explained, except that we are not persuaded from any authoritative source that unearned premiums are or ever were held in trust by insurers for reinsurance or that policy holders had a preferential right to unearned premiums over other creditors against the estate of the insurer. Section 17 of the Insurance act (Comp. Stat. p. 2845) permits reinsurance, but we find nothing in our insurance laws, nor in the rules of the department, requiring segregation of unearned premiums, and it is not practiced by insurance companies; unearned premiums *Page 553 
are treated as general funds, unearmarked. Section 47 refers to "premiums reserved" as liabilities, as does section 62, and section 56a of the amendment of 1931 (P.L. p. 599) includes the "amount requisite for the reinsurance of all its outstanding risks," as a general liability. Section 70 provides for annual reports of financial condition in form prescribed by the commissioner, and the form under the capition "Liabilities" requires a statement of "unearned premiums" as a liability set up against assets to show net financial worth; it is purely a bookkeeping item, "a balance sheet figure." The legislative recognition of unearned premiums as liabilities and the departmental form of accountancy surely do not lend support to the theory of a trust fund; our insurance laws do not allow the commissioner to use unearned premiums to effect reinsurance upon insolvency; to the contrary, the statute imposes upon him the duty of distributing assets equally among creditors.
It is asserted that reinsurance of the selected liability was of advantage to New Jersey, its "forgotten" surety and guarantee policy holders and its creditors in general in that for $1,000,000 Commercial relieved New Jersey of a $1,500,000 liability and because the cost of reinsurance was but a sixty-six and two-thirds per cent. dividend to the reinsured policy holders, whereas the prospects are that creditors will receive seventy per cent. out of the remaining assets. The fact that over $55,000,000 in claims have been deposited with insurance commissioners shatters the fancy. It is true the claims have not as yet been adjusted, but if when adjusted they approach only half the sum and the gross assets remaining, $5,250,000, good and bad, are converted into cash at their book value the yield will be but a fraction of the estimate.
It is said to be a wise policy for a failing insurance company to reinsure, that it is widely followed, and to deny it will lead to disruption of organized insurance practices. The use of funds of an insolvent company for reinsurance is unobjectionable in law unless prohibited by statute and, in the absence of such enactment, insolvent companies are on the same footing as insolvent individuals and may prefer *Page 554 
creditors. Turp v. Dickinson, 100 N.J. Eq. 41. The restriction upon corporate power embodied in section 64 of the Corporation act was omitted from the revision of 1877, and inWilkinson v. Bauerle (1886), 41 N.J. Eq. 635, it was held that an insolvent corporation could prefer one creditor over another. After Montgomery v. Phillips, 53 N.J. Eq. 203, was decided in chancery the restriction was restored (P.L. 1895 p.196) and later incorporated in the revision of 1896 as section 64.
Section 64 of the Corporation act reads:
"Whenever any corporation shall become insolvent or shall suspend its ordinary business for want of funds to carry on the same, neither the directors nor any officer or agent of the corporation shall sell, convey, assign, or transfer any of its estates, effects, choses in action, goods, chattels, rights or credits, lands or tenements; nor shall they or either of them make any such sale, conveyance, assignment or transfer in contemplation of insolvency, and every such sale, conveyance, assignment or transfer shall be utterly null and void as against creditors; provided, that a bona fide purchase for a valuable consideration, before the corporation shall have actually suspended its ordinary business, by any person without notice of such insolvency or of the sale being made in contemplation of insolvency, shall not be invalidated or impeached. (L. 1896,ch. 185, p. 298 § 64; C.C. p. 1638, § 64.)"
The principle underlying the policy declared by this action is that upon insolvency the assets of a corporation become trust funds for creditors and that any willful diminution is a fraud upon the trust and forbidden. Indeed, the title to the act as originally introduced into our Corporation law, "An act to prevent frauds by incorporated companies" (P.L. 1828 p. 58), carries this significance. The injunction to directors and managers of corporations upon insolvency to conserve the assets and keep them intact is unmistakable, and under our oft-repeated definition of insolvency," a general inability to meet pecuniary liabilities as they mature by means of either available assets or use of credit" (National Bank of the Metropolis v. Sprague,21 N.J. Eq. 530) it is not difficult for directors to determine when compliance must be yielded. *Page 555 
New Jersey was not only insolvent to the knowledge of its directors when the securities were diverted, but it had actually suspended its ordinary business, and Commercial had notice of both condition and situation. It had strolled into dangerous fields when it engaged in the fidelity and surety business, became venturesome, prodigal and finally was overwhelmed by debts and claims, hopeless in their magnitude. Commercial, through Bassett, its chairman, knew of the predicament. He, an experienced insurance man, knew that old established insurance companies like New Jersey do not quit unless fatally stricken financially, and that New Jersey, after a proud career of sixty years and more, would not fold its tent and retire for any other reason than that it could no longer carry on, meet its huge stack of unpaid debts and hopefully face the ever-mounting and enormous claims on its guarantees of obligations of others. He admits he knew New Jersey was in trouble, but denies knowing it was insolvent Does he mean he did not know how deeply it was insolvent? His business with New Jersey, he naively affirms, was solely to reinsure its better risks for a price and profit; that it was none of his concern whether the company was solvent or insolvent, that he made no inquiry; he had examined the December 31st, 1931, annual report, but that intimated no distress, although it showed losses in staggering figures in surety and guarantee risks, and how heavily it was committed for more, he did not stop to learn — his mission was reinsurance. That attitude ignored grave responsibilities and it deprives Commercial of the equity of a bona fide purchaser for a valuable consideration without notice, reserved to such purchasers by the proviso of the statute. Bassett was dealing with a corporation known to him to be in financial difficulties, with a once powerful competitor, crippled and done, where some sympathetic inquiry as to the ailment would seem to be an orderly reaction, and if he was not concerned, as he insists, he was nevertheless put on guard, and it became a duty to inquire and he stood charged with notice of that which he would have learned had he investigated — that New Jersey was hopelessly insolvent. The negotiations were in May, more *Page 556 
than five months after the 1931 annual report, which he inspected; the department examiners were at work and they had the latest and up-to-date facts of the company's condition and Bassett knew it. He could have had the reports for the asking and he did not ask. Commercial cannot plead innocence because Bassett did not see or hear, because he would not look or listen.Horton v. Bamford, 79 N.J. Eq. 356. And further, Commercial has not the status of an innocent purchaser, because at the time of the transfer of the securities, New Jersey had actually suspended its ordinary business to the knowledge of Commercial. "Actually suspended its ordinary business," as used in the proviso of the statute, means suspension of operations due to insolvency — the red light to purchasers that the directors of the corporation are disabled from making transfers. Hoover SteelBall Co. v. Schafer Ball Bearing Co., 89 N.J. Eq. 433. We need look no further than the insurance agreements and the letters to the agents for demonstration that operations were suspended when the insurance agreements were entered into. They confess it. Suspension was incident to the reinsurance and a step in the scheme to surrender to the commissioner. Commercial's thought that New Jersey was going into self-liquidation disparages Bassett's reputation as a highly technical insurance man. He knew that with some of its liability reinsured and the rest left to shift for itself, with enormous debts and terrific claims and limited assets, New Jersey was heading straight for the embrace of the insurance commissioner; an unfortunate victim of an inevitable fate. New Jersey's covenant, part consideration for the reinsurance agreements, that it would not at any time thereafter (May 19th) engage in or carry on the business of insurance of any kind, and the letters (May 20th) to the agencies (unless they joined Commercial they were definitely instructed to cease writing any and all business for account of the company, and in any event they were not to write any fidelity and surety lines), are indubitable proof that New Jersey suspended operation when the agreements were executed, and conclude Commercial. Apparently, the agreements were not executed *Page 557 
on the date they bear (May 19th), for the resolution of New Jersey of May 19th to reinsure, and the letters to the agencies (May 20th) mention only reinsurance of the specific classes, whereas one of the agreements reinsures fidelity and surety lines written by two named agencies, evidently the subject of later negotiations. The mortgages were not delivered until May 24th; the assignments bear date May 27th and were acknowledged May 28th, the day of the demise. We speak of these things only to show that Commercial had ample opportunity to withdraw upon reflection that it was unlawfully taking the assets of an insolvent company after it had suspended its ordinary business.
It is contended that section 64 of the Corporation act is not applicable to insurance companies. The section comprehends "any corporation;" it includes all corporations. Suydam v.Receivers of the Bank of New Brunswick, 3 N.J. Eq. 114; Parsons
v. Monroe Manufacturing Co., 4 N.J. Eq. 187. And section 2 of the Corporation act that "* * * every corporation * * * shall be governed by the provisions and be subject to the restrictions and liabilities in this act contained, so far as the same are appropriate to and not inconsistent with such charter or the act under which such corporation was formed; * * *" firmly welds the restrictions of the Corporation act to all corporate charters unless inimical. Cohn v. Colgan, 97 N.J. Eq. 9. We are not informed of anything sacrosanct in insurance companies, nor has any reason been advanced for their immunization from this wholesome restriction upon corporate power, or why directors of moribund insurance companies, of all companies, should be privileged to perpetrate fraud upon creditors. It may be, as counsel characterizes, that Commercial was engaged in the "laudable design of making assurances," nevertheless insurance is cold business, with benefit to many and profit to few, and if praiseworthy, the calling is not licensed to ignore the statute.
The situation which we have recorded finds a close parallel inTurp v. Dickinson, supra. Dickinson Company owed the First National State Bank $45,000 and borrowed an *Page 558 
additional $45,000, giving the bank a chattel mortgage on all its property for $90,000. The corporation was in fact insolvent although the management felt its assets exceeded its liabilities, and it was so represented to the bank. The loan was made upon condition that the company should go out of business and it accordingly suspended operations, paid its admitted creditors in full and quit. A concern whose claim had been repudiated, recovered judgment and had a receiver appointed who filed a bill to fasten liability upon the bank, which had realized on its chattel mortgage. Vice-Chancellor Leaming, in holding the mortgage invalid, ruled:
"Nor can the loan which was made by the bank be said to have been made before the corporation had `actually suspended its ordinary business' within the intent of the proviso of section 64, since suspension was exacted by the bank as a precedent condition of its loan, and that requirement was acceded to by the corporation.
"Since, in the circumstances ascertained, section 64 of our Corportion act forbids a corporation to transfer its assets and declares such transfers `utterly null and void as against creditors,' it necessarily follows that not only the mortgage but also the future payment of the indebtedness of the corporation to the bank were within the statutory inhibition. See Miller v.Audenreid, 67 N.J. Eq. 252."
The transfer will be set aside and the securities ordered delivered to the commissioner of banking and insurance. Commercial may present its claim for the unearned premiums and will be subrogated to the rights of the policy holders reinsured by it. *Page 559