National Bank of the Metropolis v. Sprague.

THE NATIONAL BANK OF THE METROPOLIS and others, appellants, *vs.* SPRAGUE and others, respondents.

1. In strict practice, a complainant is put to his supplemental bill, and a defendant to his own cross-bill, to raise a defence, arising *pendente lite*, affecting a co-defendant.

2. When a party is brought into equity, he is entitled to an equitable decree according to his case as it then exists.

3. A chattel mortgage duly filed does not, by want of refiling, lose its priority over a subsequent one taken before the time for refiling arrives.

4. If a chattel mortgage is filed, or possession is taken under it before a subsequent mortgage is given, it maintains its priority.

5. Insolvency defined.

6. A mortgage given by an insolvent firm to trustees to secure bonds, which the debtors subsequently passed to their creditors, declared to be void under the second section of the statute of frauds, and within the rule in *Owen* v. *Arvis*, 2 *Dutcher* 23.

7. But it is void only as to those creditors who have raised the issue by their pleadings.

8. The right of the insolvents to pass the bonds to their individual creditors not assented to.

Before this cause came to hearing, the appeal of the bank was settled, and the argument had upon the other appeals. The opinion of the Chancellor is reported-in-5 *C. E. Green* 23.

*Mr. Williamson* and *Mr. C. Parker*, for Klous and Hillburn.  *Mr. Gilchrist*, Attorney-General, for Woolman Stokes.  *Mr. W. H. Vredenburgh*, for Elisha Woolley.

The opinion of the court was delivered by

VAN SYCKEL, J.

This is a strife for priority between the creditors of Sprague and Stokes.  The statement following will disclose the facts applicable to the questions discussed on the appeal :

C. C. Sprague and Howard A. Stokes, by written contract bearing date September 7th, 1865, had stipulated to pur-

chase of Woolman Stokes, the Continental Hotel property at Long Branch, on certain terms therein specified. On the 27th day of March, 1866, Woolman Stokes conveyed the property to Howard A. Stokes, and Lydia J. Sprague, the wife of C. C. Sprague, subject to a mortgage of $15,500, then existing on the premises, and the vendees executed a mortgage of the same date to Woolman Stokes, to secure $29,500 of the purchase price, which was duly recorded.

Thereafter the following mortgages were executed by them on the real estate: To Klous and Hillburn, May 18th, 1866, for $35,000. To A. V. Conover, November 2d, 1866, $1020.10; and the following chattel mortgages: To Klous and Hillburn, May 24th, 1866, for $30,000. To Woolman Stokes, November 2d, 1866, for $12,000; and a mortgage covering both the lands and chattels, to Allen and Mitchell, trustees, acknowledged October 8th, 1866, securing the payment of one hundred bonds of $1000 each, payable in three years to blank or bearer.

November 30th, 1866, the Bank of the Metropolis recovered their judgment in the Supreme Court of this state against C. C. Sprague, for the sum of $65,892.80, and thereupon filed their bill as hereinafter set forth.

The first question submitted is, whether the chattel mortgage of Klous and Hillburn, for $30,000, which will be called the Klous mortgage, must be displaced, because it was not re-filed between the 20th of June and the 21st day of July, 1867?

Woolman Stokes, who holds a subsequent chattel mortgage, claims now to be preferred by reason of the default of Klous and Hillburn in re-filing their mortgage within the time required by law. The Klous mortgage is dated May 24th, 1866; was filed July 20th, 1866, and re-filed May 10th, 1867. The Woolman Stokes mortgage is dated November 2d, 1866; filed November 7th, 1866, and re-filed October 10th, 1867.

Prior to June 20th, 1867, while the Klous chattel mortgage was a perfect security in the order of priority in which

it originally stood, the following facts mark the history of this case :

The Bank of the Metropolis, on the 6th of November, 1866, filed their original bill, and on the 20th of March, 1867, their supplemental bill, to which Sprague and Stokes, Klous and Hillburn, Woolman Stokes, and the trustees above named were made defendants, setting up, among other things, that the trustee mortgage was intended to delay and hinder creditors, and therefore void; and that a less amount was due to Klous and Hilburn, and Woolman Stokes, than appeared on the face of their respective mortgages, and praying that they might be enjoined from proceeding at law upon their mortgages; that upon an account being taken of the amount actually due, the complainants might be permitted to redeem those securities, and be subrogated to the rights of the mortgagees, and that the trustee mortgage might be declared to be void. March 29th, 1867, Klous and Hillburn filed their bill to foreclose their mortgage on the real estate. April 2d, 1867, the trustees and Woolman Stokes, filed their joint bill to foreclose the trustee mortgage, and Woolman Stokes' chattel mortgage, making Sprague and Stokes, the National Bank of the Metropolis, A. V. Conover, and sundry judgment creditors, defendants thereto, and setting forth the execution of the Klous chattel mortgage, the amount, date and time of filing thereof, without in anywise questioning its *bona fides* or validity, and without making Klous and Hillburn parties to their bill, although process was served upon them, and they subsequently filed an answer thereto insisting upon their priority.

To the first bill Klous and Hillburn filed their answer insisting upon, and the trustees and Woolman Stokes filed their separate answers, admitting the *bona fides* and priority of the Klous mortgage. If the case had remained in this condition, Klous and Hillburn would have been secure in their position. In the first bill no issue was made which could affect them, except as to the amount actually due on their security. In the second bill no reference was made to their

chattel mortgage, and in the third bill, it was not questioned or attacked, either in the bill, or by any answer thereto. In neither or all of those cases combined therefore, could a decree have been made depriving the Klous mortgage of its original place. The disturbing element was introduced by the filing of the fourth bill, on the 13th of September, 1867, by Klous and Hillburn, to foreclose this chattel mortgage. In the answer of Woolman Stokes to this bill, the defence to the Klous mortgage first appears, and there is no doubt that if this had been the only bill filed in the cause, the questions raised by the answer would have been properly before the court. This bill did not even preserve its detached form, there is no decree under it as a distinct cause, its progress having been arrested by the order of the Chancellor, made and filed on the 10th day of March, 1868, consolidating the four suits, and directing that the three bills last filed be treated as cross-bills to the first in order of time.

Without intending to make the case turn upon this point of practice, it is not conceded that in the suit as so consolidated, the defence now insisted upon to the Klous mortgage can be entertained. It is questionable, whether the bill last filed can be used as a cross-bill for any such purpose. It did not claim any discovery in aid of Klous and Hillburn's defence to the original bill, nor did it seek any decree against a co-defendant, which it was not within the power of the court to grant in the original suit. As a cross-bill, therefore, in aid of any relief to which Klous and Hillburn were entitled, it was entirely unnecessary, and should have been dismissed, even if filed originally as a cross-bill. If this was in the way of an equitable result, the court could hold to the strict practice, which puts a complainant to his supplemental bill, and a defendant to his own cross-bill, to raise a defence, arising *pendente lite,* affecting a co-defendant. It is true that a departure from the earlier practice enables a defendant, without cross-bill, to attack a co-defendant; but the rule has never been so far relaxed as

to permit matter happening after the institution of the suit to be put in evidence without a supplemental or cross bill.

But admitting that the defences raised by Woolman Stokes may be considered, are they available for the purpose for which they are offered? The claim of Klous and Hillburn is neither deferred nor affected, if re-filing was unnecessary, or if possession within the terms of the chattel mortgage act was taken by them. This raises three questions. First: Whether in the position these parties occupied on the 20th of June, 1867, re-filing was at all essential? Secondly: Whether in any case, failure to re-file advances the subsequent mortgage taken before the default occurs? Thirdly: Whether the possession taken by Klous and Hillburn was such as the act requires?

When the first bill was filed and these defendants were brought into court, equity assumed control over their security, and the subjects embraced in it, and these defendants thereby became entitled to an equitable decree according to the case as it then existed. The court having taken the control of a lien, then perfect at law, had full power without any aid from a court of law, or any further act of the holder, to preserve and enforce his rights. Not only was such interference by the mortgagees unnecessary, but if attempted, it would have subjected the actor to injunction process.

The rights of all the parties were fixed before the time for re-filing had arrived, and if it was necessary to re-file at all, that necessity would follow the mortgage pending the entire litigation. If prior to July 20th, 1867, the mortgaged chattels had, by order of the Chancellor, been converted into money, or a receiver put into possession of them, it would not be seriously insisted that any action was necessary on the part of these defendants, for they could not in either case take possession, and having by the statute an election to do either of two things, they cannot be restricted to one. The possession taken under the order of the court would enure to the benefit of those entitled to the avails of

the goods, and in equity it can make no difference, whether such conversion was made, or actual possession taken, at an earlier or later period; it was subject to be done at any time, without the option of Klous and Hillburn, and therefore, in contemplation of equity, the fund must be considered as in court for equitable distribution, from the time jurisdiction of the parties and subject matter attached. If this is not so, it would be necessary for the claimants, whose claims are filed under the mechanics' lien law, in order to preserve the vitality of their liens, to pursue their remedy at law, by issuing summons thereon within the prescribed time, after they have been brought into a court of equity; and a junior judgment creditor, after admitting in his answer the priority of an older judgment, might gain precedence over it by issuing an execution at law. The result would be, that equity would not be able, unassisted, to give the relief to which a party is indisputably entitled when its aid is invoked, but must, from time to time, send the parties before it to a court of law, or remit them to their own action, to maintain their standing in its tribunals. That a court of equity exercises a power so imperfect and inadequate, has never been supposed. If the court is so feeble in its power, the injunction issued the 7th of November, 1866, should have been dissolved, and these defendants let free to take care of themselves.

Unless this view prevails, the doctrine of *lis pendens* would be subverted, for it is well settled that a purchase made of property actually in litigation, *pendente lite,* for a valuable consideration, and without any express or implied notice, in point of fact, affects the purchaser in the same manner as if he had such notice, and he will be bound by the judgment or decree in the suit. 1 *Story's Eq.,* § 405.

The third section of the act respecting chattel mortgages, does not declare that the default shall void the mortgage; it only ceases to be valid against certain classes of persons, *viz.* against creditors of the mortgagor, and against purchasers or mortgagees in good faith.

It is insisted that the words " in good faith" mean " without fraud," and that the second mortgagee has the priority cast upon him, not by any act of his own, but by operation of law, and therefore he can be guilty of no fraud in taking it.   It is no fraud in the second mortgagee to take a mortgage in any case with full notice of a prior unrecorded mortgage, but the fraud, against which relief is always given, consists in his attempting to set it up in displacement of the first.   The fraud of Woolman Stokes is, that after he has taken his position voluntarily as second mortgagee, he attempts to set up a default which does him no harm, and asks the court so to construe the act as to inflict a penalty on his adversary.   The words " in good faith," cannot be applied to creditors in this section, and therefore, if they are rendered " without fraud," purchasers and mortgagees with fraud cannot take priority, but creditors with fraud may.

Another consequence of this construction would be, that a purchaser of the chattels, before the default in refiling, subject to the mortgage, would, after the default occurred, hold them free of the encumbrance, even where the amount of the mortgage was deducted from the price he paid, while a subsequent purchaser with notice would be subject to the opposite rule.   In fact under the rule claimed, the person who does not file at all occupies a better position than he who does, as can be illustrated in this case.

Woolman Stokes took his mortgage with full notice of the Klous mortgage, and therefore it will be admitted, that under the first section of the act, if Klous had not filed at all, Stokes could never by any default on the part of Klous have acquired the priority, but by the act of filing, Klous makes his security subject to be postponed by the third section for not re-filing.   It could not have been in the mind of the legislature that such consequences should flow from the passage of this law, and therefore some other interpretation must be sought for, by which the mischief aimed at may be repressed.   Accepting these words " in good faith," in what has almost become their technical meaning, " without no-

tice," the third section will be restricted to subsequent purchasers and mortgagees without notice, and what is conceived to be the policy of the statute will be fully effectuated. The publicity exacted by the act will be enforced, and purchasers and mortgagees who take their positions, without notice of prior existing equities, will be amply protected.

On the 26th day of April, 1867, before the time for refiling had arrived, Klous and Hillburn took possession of the mortgaged chattels, by putting their foreman in charge of the Continental Hotel, the furniture of which composed the chattels in question, and ran it the ensuing season in their own names, placing Sprague and wife, and Howard A. Stokes, in a subordinate position on salaries. That Woolman Stokes was cognizant of such possession being had, is attested by his signature to the agreement of April 26th, 1867, and by other evidence in the cause, and that possession is fully recognized by the Chancellor in the order of consolidation, and by the decree in the case.

Did this possession, which was continued in the form so taken, satisfy the exaction of the statute? It is insisted that it was not immediate; that if not taken when the mortgage was executed, it has no virtue. Such an interpretation of the act is entirely too narrow, and if strictly held, would lead to results that would be inadmissible. What is immediate in such strict sense? Must it be simultaneous with the execution of the instrument? Can an hour, or a day, or a week elapse between the two acts, without vitiating the security? Will it be insisted that if three months after the mortgage was delivered the mortgagee took open possession, a mortgage taken a year thereafter would displace the first? Such could not have been the legislative intent. The object of the enactment was to give publicity to such transactions, and to sweep away these secret arrangements, by which creditors were embarrassed and defeated, and purchasers defrauded. If the subsequent mortgage is delivered before the filing of, or possession taken under, the prior one, the prior mortgage is deferred. The word immediate is

used to exclude any presumption that the possession taken may relate back to the date of the security, and thus defeat the intermediate encumbrance. This construction, with regard to possession, will give it the same virtue given by this court to the act of filing, in *De Courcey* v. *Collins*, and it is manifest that the legislature intended to give the one act neither more nor less effect than the other. The mortgagee is secure, if he files or takes possession before a subsequent mortgage is given.

In every view, therefore, the Klous mortgage is entitled to its original place, and the clear right of the case is thereby promoted. It is certain that Woolman Stokes has no equitable claim to supplant it, and if permitted to do so, it would be only by the hard rule of positive statutory requirement, for, as before stated, by his answer to the bill of the bank, and by his own bill, he sets up and admits the priority of Klous and Hillburn, and the answer of Klous and Hillburn to the amended bill of the bank, filed July 1st, 1867, within the thirty days for re-filing, gave notice to Stokes that they still insisted upon their lien.

The second question regards the validity of the trustee mortgage, bearing date September 1st, 1866, acknowledged October 8th, 1866, recorded October 10th, 1866, and filed as a chattel mortgage, October 15th, 1866, given to secure one hundred bonds of $1000 each, payable in three years to blank or bearer. It is abundantly proved that when this mortgage was executed, Sprague and Stokes were pressed by their creditors for payment or security for their claims, unable to meet their pecuniary engagements, and involved in debt to an amount beyond their ability to pay, and that their creditors were informed of their condition. Under this state of facts, Sprague and Stokes, in contemplation of law, were insolvent. Insolvency means a general inability of a debtor to answer pecuniary engagements, and it does not follow that he is not insolvent because he may ultimately have a surplus after winding up his affairs. *Sug. on Vendors* 668; *Bayly* v. *Schofield*, 1 *Maule & S.* 338; *Hall* v. *Swift*, 4 *Bingham's N. C.* 381.

The trustee mortgage provides that until default occurs in the payment of the bonds, Sprague and Stokes should remain in possession of the mortgaged premises and the personal property, and receive the rents, issues, and profits thereof. After the mortgage was executed, the bonds were left in the hands of the mortgagors for distribution among their creditors, or for such disposition as they might choose to make of them. Mr. Mitchell, one of the trustees, testifies that shortly after the execution of the mortgage, a meeting of some of the creditors was held in New York, at which they were urged to take these bonds, and the inducement held out to them was, that they would be secured by taking them, while their claim would be more doubtful if they did not, and there would be delay in litigation and expense attending a prosecution, and that the creditors seemed to be willing, after hearing these representations, to take the bonds. Rowland Johnson, one of the creditors who attended the meeting in New York, says, it was understood at that meeting that Sprague and Stokes were not able to pay any other way than by these bonds, and that the best thing the creditors could do was to take them. Under these circumstances the mortgage was executed, and the bonds passed to the creditors.

That a debtor in insolvent circumstances may prefer certain creditors, has been too long the received law of this state to be questioned now. But the proposition that an insolvent may execute a mortgage to trustees, payable in three years, or twenty years, at his pleasure, for an amount that will more than absorb his property, and take the bonds secured by it into his own possession, and with his property thus beyond the reach of legal process, pass them to such of his creditors as may feel constrained to accept them, has heretofore received no judicial sanction in this state. A scheme better adapted to delay and hinder creditors, cannot well be conceived. This device operated as an obstruction to creditors, and its effect in this case was, as it will be in all cases, to coerce them into acceding to the debtor's terms,

under the apprehension that otherwise the bonds would be negotiated to *bona fide* purchasers, or passed to other creditors, whose fears could be more readily excited. The creditor when offered these bonds, at once saw that he would be subjected to an expensive litigation to sweep away this mortgage in the pursuit of his legal remedy, and it must be conceded, that if this plan can be successfully carried out, the debtor will practically dictate terms to those to whom he is indebted, and it will be at his option whether they shall take a security maturing in three or in thirty years.

After this mortgage was executed, and before Sprague and Stokes passed away the bonds, equity, on the application of a judgment creditor, would certainly have enjoined their transfer, on the ground that the proceeding was in delay of creditors; the transaction must still be vicious, unless their success in negotiating them before the resistance of legal process could be interposed, has changed its character. It is no answer to say, that while this scheme was unlawful on the part of Sprague and Stokes, the creditors, who took them in good faith as the best thing they could do under the circumstances, should not be disturbed. This reasoning would in almost all cases render the statute of frauds a dead letter. But creditors, under such circumstances, are tainted with the fraud inhibited by the statute; they are presumed to know the law, and are chargeable with a knowledge of the fact that such conveyance is in contravention of positive enactment, and they thus become partners in the fraud which is imputed to their debtor.

· This case cannot be distinguished in principle from *Owen* v. *Arvis*, 2 *Dutcher* 23. In that case Owen, the insolvent debtor, desiring to prefer his other debts to those which he had incurred as surety for one Bross, conveyed his estate real and ·personal to his son, and took back from the son a mortgage of $11,000, securing bonds, of which $500 matured each year until the whole were due. In pursuance of the express purpose for which this transfer was made, the father in a short time thereafter passed this mortgage to the

favored creditors. The Bross creditors having obtained judgments, levied on the goods conveyed to the son, who thereupon replevied. Chief Justice Green, in delivering the opinion of the court, says : " That the question of fraud cannot enter at all into the discussion, that that point was submitted to the jury and decided by them, and that it must be assumed that the transfer to the son was for a valuable consideration, and that in point of fact there was no fraud meditated or perpetrated." " That admitting that the conveyance by the father and the subsequent assignment of the mortgage to the creditors, constitute but parts of one and the same transaction; that the sale was, in fact, made for the benefit of the creditors, and the proceeds honestly applied in payment of their debts, upon the terms specified in the deed of assignment, still the conveyance was illegal and void as against creditors, whose claims were hindered or defeated." " That the conveyance was fraudulent and void, under the second section of the act to prevent frauds and perjuries, because the consideration money of the purchase was left in the hands, and under the control of the vendor. The bond and mortgage was held by the debtor subject to his own absolute control. The case, as made by the debtor himself, is that the debtor might control the proceeds, and apply them to the payment of such debts as he felt under the greatest obligation to pay. By the well settled principles of law, in the absence of all statutes regulating assignments, an assignment or conveyance of property for the benefit of creditors is void, if the property is left to any extent under the control of the debtor ; the rights of the creditors must be fixed by the deed itself."

Again: the Chief Justice quotes with approbation the language of Judge Jewett, in *Sheldon* v. *Dodge*, 4 *Denio* 221 : " I take it to be well established, and the doctrine was not controverted on the argument, that a debtor cannot put his property beyond the reach of creditors, by assigning it to trustees for the payment of his debts, unless at the time he definitely settle their respective rights by the convey-

ance." And Justice Potts, in his opinion, says : "That the debtor subsequently, in pursuance of his intention at the time of the conveyance, assigned the mortgage to a·portion of his creditors, does not purge the fraud. If the creditors, who accepted the compromise offered them, have been thereby placed in an unfortunate position, it is to be regretted, but we might as well repeal the statute of frauds entirely as to permit it to be thus evaded."

How can the trustee mortgage be sustained, under the application to it of the criticism of the court in *Owen* v. *Arvis?* What substantial distinction can be drawn between the two cases? There it was an absolute conveyance of the debtor's property; here it was by way of mortgage for over $80,000 more than the property produced at the sale; a difference in form, not in substance. In *Owen* v. *Arvis*, the effect of the conveyance was to put under the control of the debtor the mortgage which represented his property; in this case it put into the hands of Sprague and Stokes the bonds which the mortgage on their property secured. There the question of intentional or actual fraud and the form of the conveyance were eliminated from the discussion, and the scheme swept away because it effected precisely what has been done in this case. This transaction must, therefore, be regarded as one intended to hinder and delay creditors, within the meaning of the second section of the statute of frauds.

The rule of law thus announced does not, however, dispose of this branch of the case. The question remains, as to whom this trust mortgage shall be treated as void, in the situation in which this case presents the respective parties to the court. The statute does not make it absolutely void; it is good as between the parties; it is good as against everybody but those who are hindered or defeated. It is to be distinguished from the case of a security declared absolutely void as to all persons, for usury or gaming, where the other encumbrances must,. *ex necessitate*, when the tainted instrument is removed, take its place.

In this case a person claiming to set aside the vicious conveyance must establish his position as one of those in whose aid the statute is framed. That he occupies such position the parties adverse to him in interest may contest, and the only way in which the issue can be formed and this matter brought to the consideration of the court, is by the pleadings. If the creditor sets up this defence in answer, the debtor or the preferred creditor may show that he assented to the arrangement, that he has released his claim to the property affected by it, or any other matter applicable to the case, and if he files no answer, the court cannot even say that he is dissatisfied with the arrangement. The affirmative is upon the creditor, and it is incumbent upon him to place himself upon the record so that his opponent can be heard and his case adjudicated. "It is a fundamental maxim that no proof can be admitted of any matter which is not noticed in the pleadings. This rule applies as well to answers as to bills, and a defendant cannot avail himself of any matter in his defence which is not stated in his answer, although it should appear in evidence." 2 *Daniell's Ch.* 992–993, and cases cited in notes.

Woolman Stokes joined in the bill with the trustees to foreclose their mortgage and the chattel mortgage to himself for $12,000, in which he asks for a decree enforcing them in the order of their respective dates, and he also joined with Sprague and Stokes and the trustees in their answer to the bill of the bank, setting up the validity of the trustee mortgage, and therefore his $12,000 mortgage cannot, in any event, gain priority over the trustee mortgage. The right of priority as between the $12,000 mortgage and the creditors holding liens subsequent in date, not having been submitted to this court, cannot now be settled.

The creditors who have failed to file their answers, setting up that this trust mortgage operated to hinder or delay them, can have no relief here. Of that class is Elisha Woolley, who, though an appellant here, filed no answer in the court below, and therefore his appeal must be dismissed.

To the creditors who did answer, no relief can be extended until they are properly before us by appeal. Of the latter class are A. V. Conover, Arthur Kendall, and Stratton and Brother: There may be others who have been overlooked in my examination of the mass of papers in this case.

Under the view here taken it is not necessary to determine whether the ten bonds given to Klous to secure the advances made to Mrs. Sprague, which is her individual debt, and the fifteen bonds given to Woolman Stokes to secure the individual debt of Howard A. Stokes to him, are valid as against creditors. The bondholders, not having made that issue, cannot contest it as between themselves: To exclude any presumption that the validity of that appropriation of the partnership funds is assented to, it may be well to say, that in *Kirby* v. *Schoonmaker, 3 Barb. Ch.* 47, Chancellor Walworth held the contrary doctrine, and based it upon what seems to be sound reasoning.

The result is, that the decree below must be reversed, and a decree rendered giving the Klous and Hillburn chattel mortgage the place it originally occupied in order of priority, with costs to them in this court and in the court below.

Let the record be remitted to the court below, that there may be a reference and decree in accordance with the views herein expressed.

The whole court concurred.